UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 22-CV-2834

| | |
|---|---|
| Sam MEEKS,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF MINNEAPOLIS, a municipal entity; Darcy KLUND, Minneapolis Police Sergeant; Marcus OTTNEY, Minneapolis Police Officer; Kyle POND, Minneapolis Police Officer,<br><br>    Defendants. | COMPLAINT SEEKING MONETARY DAMAGES, DECLARATORY JUDGMENT, INJUNCTIVE RELIEF<br><br><br>DEMAND FOR JURY TRIAL |

## <u>GENERAL INTRODUCTION</u>

1.    This is an action seeking money damages under 42 U.S.C. § 1983 for Defendants' violations of Plaintiff's constitutional rights under the Fourth Amendment to the United States Constitution.

2.    This action states *Monell* and *Canton* claims under 42 U.S.C. § 1983 against the City of Minneapolis. These claims are based on, *inter alia*, Minneapolis's unconstitutional customs of tacitly authorizing or being deliberately indifferent to: (i) unreasonable searches and seizures conducted by Minneapolis police officers, (ii) MPD's race-based policing practices, (iii) training, supervising, and disciplining MPD officers.

3.     This action also states common law claims for false arrest and false imprisonment pursuant to MINN. STAT. § 466.02.

## PARTIES

### Plaintiff: Sam Meeks

4.     Plaintiff Sam Meeks is a United States citizen who currently resides in Minneapolis, Minnesota.

### Defendants

5.     Defendant City of Minneapolis ("Minneapolis" or "the City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

6.     The Minneapolis Police Department ("MPD") is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

7.     Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal claims.

8.     Defendant Darcy Klund was at all relevant times a sergeant with the Minneapolis Police Department. Numerous civilian complaints have been lodged against Defendant Klund, and most or all have been closed without effective discipline. Defendant Klund retired from the MPD in 2021 subsequent to Plaintiff's arrest.

9.   Defendant Marcus Ottney was at all relevant times a Minneapolis Police Officer. Numerous civilian complaints have been lodged against Defendant Ottney, and most or all have been closed without effective discipline.

10.  Defendant Kyle Pond was at all relevant times a Minneapolis Police Officer. Numerous civilian complaints have been lodged against Defendant Pond, and most have been closed without effective discipline, though he was suspended for a period in 2020.

11.  Plaintiff is informed, believes, and thereupon alleges that the Defendants are factually and proximately responsible for the damages and injuries alleged herein.

12.  Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendants Klund, Ottney, and Pond were the agents, servants, and employees of Minneapolis and were acting at all times within the scope of agency and employment and with the knowledge and consent of their principal and employer.

13.  At all relevant times, Defendants Klund, Ottney, and Pond were acting under color of state law.

## JURISDICTION & VENUE

14.  This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 42 U.S.C. §§ 1983, 1988. Supplemental jurisdiction over state claims is appropriate as the events in question

"derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

15.     Venue properly lies in the District of Minnesota under 28 U.S.C. § 1391(e)(1) because all the events giving rise to this claim occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

## FACTUAL BACKGROUND

16.     On February 23, 2021, Plaintiff was parked in Minneapolis when the Defendant Minneapolis Police Officers arrested Plaintiff.

17.     Defendant Ottney and Defendant Sgt. Darcy Klund approached Plaintiff's vehicle from the north and parked their squad car nose to nose, or hood to hood, with Plaintiff's vehicle.

18.     A separate MPD squad car parked behind the vehicle.

19.     Defendant Pond and his partner pulled their squad car in at an angle alongside the vehicle.

20.     "As a result, the vehicle was blocked in by law enforcement." *United States v. Sam Horace Meeks*, Case No. 21-cr-00088-ADM-TNL, Doc. 49: Report & Recommendation at 7 (D. Minn. Feb. 24, 2022).

21.     The Defendant MPD officers intended to and did block Plaintiff in, open his vehicle door, and perform a warrantless search of the vehicle to try and locate a firearm.

22.     Defendant Ottney approached Plaintiff's vehicle with his service weapon drawn and said, "Police. Police. Hands on top of your head. You're under arrest." *Id.* at

7 (citations omitted).

23.   Defendant Ottney was pointing his service weapon at Plaintiff's head until Plaintiff was placed under arrest.

24.   At the time Defendant Ottney placed Plaintiff under arrest, "he did not know who the driver was; whether the driver had a permit; whether the firearm was in the vehicle; or if the firearm was loaded." *Id.* (citation omitted).

25.   "Other law enforcement officers were also present, including [Defendant] Pond, who also had his service weapon drawn." *Id.* at 8 (citations omitted).

26.   Defendant Pond and another law enforcement officer came up to Plaintiff's driver's side door with Defendant Ottney while Sergeant Klund approached on the passenger side of Plaintiff's vehicle. *Id.* (citation omitted).

27.   Defendant Ottney "attempted to open the driver's side door but it was locked, so he directed [Plaintiff] to unlock the door and [Plaintiff] complied." *Id.* (citations omitted).

28.   "The driver's door was opened and [Defendant] Pond instructed [Plaintiff]… to put his hands on top of his head and interlock his fingers." *Id.* (citations omitted).

29.   None of the Defendant Officers saw any firearm in Plaintiff's vehicle as they were approaching. *See id.*

30.   When the door opened, Defendant Pond observed a firearm in the vehicle door.

31.   Defendant Pond removed Plaintiff from the vehicle using a takedown technique. *See id.* A MPD officer then placed his knee on Plaintiff's back while Plaintiff was lying face-down in the road and being handcuffed.

32.  Defendant Ottney previously testified that, "at the time [of Plaintiff's arrest], he did not know whether [Plaintiff] was ineligible to possess a firearm … or whether there was a warrant out for [Plaintiff]'s arrest." *Id.* at 9 (citation omitted).

33.  Defendant Ottney "testified that his approach… was based on the report of a male being in possession of a firearm" near a geographic location that he believed to be "a very high crime area of the city." *Id.* (citation omitted).

34.  Though Defendant Ottney did not state as much in his testimony, he also considered that Plaintiff was a *black* male prior to seizing Plaintiff's person and property without a warrant. *See id.* at 4 (demonstrating Defendant Ottney was informed immediately prior to the arrest that Plaintiff was "a black male…").

35.  The Defendant Officers did not know that Plaintiff had an active arrest warrant until after they had unreasonably seized him and placed him under arrest despite lacking any reasonable suspicion that a crime had been committed or probable cause capable of supporting the initial arrest. *See generally id.* at 9.

36.  Defendant Ottney "agreed that he did not have a basis to arrest [Plaintiff] when he approached the vehicle and that none of the law enforcement officers knew who [Plaintiff] was at the time [Defendant] Ottney approached the vehicle." *Id.* at 10.

37.  After restraining Plaintiff, the named Defendants illegally searched Plaintiff's vehicle and person.

38.    On September 24, 2021, MPD Officer Standal subjected Plaintiff to a custodial interrogation at the Hennepin County Jail.

39.    Officer Standal later admitted that he did not ask Plaintiff if he wanted to waive his rights to remain silent or speak only in the presence of his attorney but nonetheless asked Plaintiff questions about the circumstances underlying Plaintiff's arrest.

40.    Four minutes into the 17-minute custodial interrogation, Plaintiff said "I'mma end it. I'mma end it. I'mma endit." Officer Standal continued talking with Plaintiff and asking questions for 13 more minutes, including questions about the firearm and magazine found in the vehicle.

41.    On February 25, 2021, a criminal complaint was filed in the Hennepin County District Court (Case No. 27-CR-21-3830) charging Plaintiff with two criminal counts: (1) possessing ammo/any firearm – conviction or adjudicated delinquent for crime of violence (felony), and (2) drugs – 2nd degree – sale 3 grams or more – cocaine or meth within 90-day period and firearm.

42.    Plaintiff was granted bail and was released on February 25, 2021.

43.    Plaintiff was also indicted in the U.S. District Court for the District of Minnesota (Case No. 21-CR-00088-ADM-TNL) on one count of being a Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and 924(e)(1). The indictment was filed on April 13, 2021. An arrest warrant was issued the same day.

44.    On September 13, 2021, Plaintiff was arrested.

45.    On September 16, 2021, a detention hearing was held in Plaintiff's federal case, and MPD Officer Jeffrey Werner testified, and his testimony primarily related to the alleged circumstances surrounding Plaintiff's September 13, 2021 arrest and prior efforts by law enforcement to locate Plaintiff.

46.    The Court ordered Plaintiff to be detained without bail.

47.    Plaintiff was held in the Sherburne County Jail from September 14, 2021 until March 11, 2022.

48.    During his federal criminal proceedings, Plaintiff moved to suppress the evidence obtained as a result of the search and seizure conducted by Defendants as well as statements, admissions, and answers subsequently provided to law enforcement.

49.    On February 24, 2022, U.S. Magistrate Judge Tony N. Leung recommended that Plaintiff's motion to suppress evidence be granted. Furthermore, he recommended that the motion to suppress statements, admissions, and answers be granted in part and denied in part as moot.

50.    Judge Leung acknowledged that the Defendant Officers conceded that they did not have probable cause to arrest Plaintiff when they approached his vehicle.

51.    Judge Leung also determined that the Defendant Officers did not even have the requisite reasonable, articulable suspicion of criminal activity to detain Plaintiff for an investigatory stop.

52.    Judge Leung recommended suppressing all statements Plaintiff made to law enforcement because they were taken in violation of *Miranda v. Arizona.*

53.   The federal indictment against Plaintiff was ultimately dismissed on March 11, 2022 in response to a motion to dismiss the indictment, filed by the United States on March 10, 2022.

54.   The state complaint against Plaintiff was dismissed on May 4, 2022 after reviewing the file in light of the federal suppression and dismissal decisions. The state agreed that it lacked sufficient evidence to prove the case beyond a reasonable doubt.

55.   Plaintiff was detained for a substantial period of time as a result of Defendants' unconstitutional acts. Specifically, Plaintiff was in the custody of Hennepin County Jail from February 23, 2021 until February 25, 2021 (three days) and was in the custody of Sherburne County Jail from September 14, 2021 until he was finally released on March 11, 2022 (179 days).

**MPD's Customs of Race-Based Policing, Violating the Fourth Amendment, Violating the Fourteenth Amendment's Equal Protection Clause, and Failing to Train, Supervise, or Discipline MPD Officers**

56.   On April 21, 2021, the "Justice Department… opened a pattern or practice investigation into the City of Minneapolis (the City) and the Minneapolis Police Department (MPD). The investigation will assess all types of force used by MPD officers. … The investigation will also assess whether MPD engages in discriminatory policing. As part of the investigation the Justice Department will conduct a comprehensive review of MPD policies, training and supervision. The department will also examine MPD's systems of accountability, including complaint intake, investigation, review, disposition and discipline." *Attorney*

*General Merrick B. Garland Announces Investigation of the City of Minneapolis,*
*Minnesota, and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE
(Apr. 21, 2021).[1]

57.     On April 27, 2022 the Minnesota Department of Human Rights published a
        report entitled: *Investigation into the City of Minneapolis and the Minneapolis*
        *Police Department: Findings from the Minnesota Department of Human Rights*
        ("MDHR Report").[2]

58.     Since 2010, "of the 14 individuals that MPD officers have killed, 13 of those
        individuals were people of color or Indigenous individuals. People of color and
        Indigenous individuals comprise approximately 42% of the Minneapolis
        population, but comprise 93% of all MPD officer-involved deaths between
        January 1, 2010, to February 2, 2022." MDHR Report at 10.

59.     "MPD officers use higher rates of more severe force against Black individuals…
        at a rate that is significantly disproportionate to the size of the Black population
        in Minneapolis. Although Black individuals comprise approximately 19% of the
        Minneapolis population, MPD's data shows that between January 1, 2010, to

---

[1] DEP'T JUSTICE, OFFICE PUB. AFFAIRS, ATTORNEY MERRICK B. GARLAND ANNOUNCES INVESTIGATION OF THE CITY OF MINNEAPOLIS, MINNESOTA, AND THE MINNEAPOLIS POLICE DEPARTMENT (Apr. 21, 2021), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-investigation-city-minneapolis-minnesota-and.
[2] MINN. DEP'T HUMAN RIGHTS, INVESTIGATION INTO THE CITY OF MINNEAPOLIS AND THE MINNEAPOLIS POLICE DEPARTMENT (Apr. 27, 2022), https://mn.gov/mdhr/assets/Investigation%20into%20the%20City%20of%20Minneapolis%20and%20the%20Minneapolis%20Police%20Department_tcm1061-526417.pdf.

December 31, 2020, 63% of all use of force incidents that MPD officers recorded were against Black individuals." *Id.* at 11.

60.     In response to claims by Minneapolis officials and MPD officers that "disproportionality in policing in Minneapolis is due to factors other than race," the Minnesota Department of Human Rights completed a statistical racial disparity analysis that compared "use of force incidents against Black and white individuals in *similar circumstances*." *Id.* at 12 (alteration in original). "To ensure the analysis compared individuals in similar situations, use of force incidents were compared only if MPD officers recorded the same justification for the force (i.e., the individual's recorded behavior, such as whether the individual tensed) and where the same primary offense was recorded (i.e., the alleged crime or event that led to the overall police interaction, or the alleged crime that ultimately occurred)." *Id.* at 12. "This analysis and review of use of force files and body worn camera footage demonstrate that **race is the likely reason that MPD officers use higher rates of more severe force against Black individuals compared to white individuals in similar circumstances.**" *Id.* (emphasis added).

61.     Illustratively:

        a.   "MPD uses higher rates of neck restraints or chokeholds against Black individuals than white individuals in similar circumstances." *Id.* at 12-14.

b. "MPD officers are more likely to use chemical irritants against Black individuals." *Id.* at 14-18.

c. "MPD officers are more likely to use soft tactics on white individuals than Black individuals in similar circumstances." *Id.* at 18.

d. "MPD officers are more likely to stop vehicles with people of color and Indigenous individuals when officers are more likely to identify the race/ethnicity of a vehicle's occupants." *Id.* at 20-22.

e. "MPD officers are more likely to search Black individuals and/or their vehicles during a traffic stop than white individuals in similar circumstances." *Id.* at 23-25.

f. "MPD officers are more likely to cite Black individuals during a traffic stop than white individuals in similar circumstances." *Id.* at 25-27.

g. "MPD officers are more likely to stop Black individuals for longer during a traffic stop than white individuals." *Id.* at 27.

h. "MPD officers are more likely to use force against Black individuals during a traffic stop than white individuals in similar circumstances." *Id.* at 27-28.

i. "MPD officers are more likely to arrest Black individuals during traffic stops than white individuals in similar circumstances." *Id.* at 28-30.

j.  "MPD officers improperly and excessively cite Black individuals with disorderly conduct and obstruction resulting in collateral consequences." *Id.* at 31-34.

k.  "MPD uses covert social media to target Black leaders, Black organizations, and elected officials without a public safety objective." *Id.* at 35-37.

l.  "MPD maintains a culture where MPD officers consistently use racist, mysognistic, and disrespectful language and are rarely held accountable." *Id.* at 38.

m.  "MPD provides deficient training and guidance for its officers, which exacerbates a pattern of discriminatory, race-based policing." *Id.* at 39-43.

n.  "MPD's field training program furthers a pattern of race-based policing." *Id.* at 43-44.

o.  Minneapolis "fails to provide individuals of all racial backgrounds accused of crimes with evidence relevant to their defense, and this failure disproportionately affects Black individuals who are arrested and charged at higher rates." *Id.* at 64-67.

62.  In short, the MDHR Report found that MPD officers use citations "in a discriminatory and punitive way—unjustifiably citing Black individuals at a higher rate than they cite white individuals." *Id.* at 34.

63.    MPD "Officers are not held accountable because of ineffective accountability
       and oversight systems, which contribute to a pattern of discriminatory policing."
       MDHR Report at 48-63.

64.    In 1996, Sergeant Darcy Klund was set to be permanently demoted from
       Sergeant to Officer for an undisclosed reason. He was reinstated after arbitration.

65.    In May of 1994, an Internal Affairs investigation resulted in Letter of Reprimand
       from Special Investigations Captain W.T. Berg for violating MPD R/R 5-104
       Professional Code of Conduct #14. In the May 1994 incident, Defendant Klund
       berated and humiliated officers of the River Falls Police Department.

66.    In July 2021, Defendant Marcus Ottney pled guilty and was convicted for
       driving while intoxicated. The Police Conduct Review panel unanimously
       recommended his suspension in March of 2022, finding that Ottney had violated
       the Minnesota Law Enforcement Code of Ethics. His suspension lasted 30 hours.

67.    Ottney currently has an open investigation with the Minneapolis Police
       Department for Complaint 20-09838.

68.    Defendant Kyle Pond was suspended in June of 2020 for violating MPD Policy
       Number 9-201(III)(B)(1). Defendant Pond conducted a vehicle search without a
       documented legal reason. Plaintiff's car was similarly searched without a valid
       legal reason. Officer Pond has received thirteen complaints since his tenure as a
       Minneapolis Police Officer began in 2014. Complaints 19-08262, 20-02438, and
       21-10806 remain open.

69. The above shows that the City of Minneapolis has had numerous opportunities to review the conduct of the named Defendants, but has *never* imposed any real discipline on any of the named officer Defendants, even when forced to pay tens of thousands of dollars, or sometimes hundreds of thousands of dollars, or more, in response to the unlawful acts of their officers.

70. The City has been deliberately indifferent to the unlawful acts of their officers, including but not limited to the named officer Defendants, and has indemnified them for unlawful acts committed off-duty and on-duty.

71. By failing to discipline its officers (including Defendants) for conduct that the City knows about and which violated constitutional or federal laws, the City has effectively informed the officers that they are above the law, thereby tacitly authorizing Defendants' unlawful conduct and resultant conspiracy to deprive Plaintiff, and similarly situated individuals, of their civil rights.

72. From 2013 through the first quarter of 2021, the Office of Police Conduct Review ("OCPD") received over 2,500 complaints. Two hundred eighty-three were explicitly listed as "excessive force" complaints; almost 1000 were more generically labeled as "violations of policy or procedure."

73. Only 90 of these more than 2,500 complaints resulted in discipline. Thus, there was "discipline" in only roughly 3.5% of police conduct complaints.

74. MPD's culture accepts and allows the inconsistent and insufficient use of body cameras to monitor police-related activity. When MPD introduced body cameras in 2016, an internal audit showed that officers turned their body cameras on only

65% of the time they were required to. *Max Nesterak & Tony Webster, The Bad Cops: How Minneapolis Protects its Worst Police Officers Until it's Too Late*, MINN. REFORMER (Dec. 15, 2020).[3] Although compliance rose to around 95% in 2019, only one officer has ever been disciplined for failing to turn on their body camera.

75.    MPD's Policy and Procedure Manual was in effect at all times relevant to this suit and explicitly mandates that officers ensure that all equipment shall be in record mode "for every stop/contact where a motor vehicle is involved" and that they shall "record the stop/contact in its entirety." 4-218(IV)(A)(6).

76.    The MPD also failed to ensure that its officers were aware of the proper standards for arrests and investigatory stops. The manual requires that all police action be legally justified. Specifically, 5-103 states that:

> Officers must act within the limits of their authority as defined by law and judicial interpretation, thereby ensuring that the constitutional rights of individuals and the public are protected. All investigative detentions, pedestrian and vehicle stops, arrests, searches and seizures of property by officers will be based on a standard of reasonable suspicion or probable cause in accordance with the Fourth Amendment of the U.S. Constitution and statutory authority. Officers must be able to articulate specific facts, circumstances and conclusions that support reasonable suspicion or probable cause.

The named Defendants clearly did not exercise sufficient discretion when they arrested Plaintiff without probable cause.

---

[3] Max Nesterak & Tony Webster, *How Minneapolis Protects its Worst Police Officers Until it's Too Late*, MINN. REFORMER (Dec. 15, 2020), https://minnesotareformer.com/2020/12/15/the-bad-cops-how-minneapolis-protects-its-worst-police-officers-until-its-too-late/.

77.     Policies 9-201(III)(A)(1)-(2) prohibit police searches without reasonable

        suspicion. Vehicles can generally only be searched when an officer has probable

        cause, there are items in plain view, or there is an emergency situation. 9-

        201(III)(B)(1). Defendants demonstrated a clear disregard for MPD policy and

        protocol when they searched Plaintiff's vehicle and person.

78.     City records show that MPD officials divert policy violation complaints

        regarding excessive use of force into off-the-books retraining programs.[4] Often,

        the only consequence is "coaching," a "spontaneous informal conversation with

        a supervisor."[5] However, between 2014 and 2018, in 37% of the cases referred

        for coaching, no coaching or other corrective action occurred.[6]

79.     The lack of discipline for policy violations shows that MPD and the City are not

        adequately enforcing the policies within the manual, creating a pattern and

        culture that tolerates noncompliant procedure.

80.     Due to the MPD's inappropriate training methods, evidence shows that:

        MPD officers resort to higher levels of physical force, sometimes before
        an individual is given the opportunity to respond to verbal commands,
        and even when the individual does not pose an imminent threat to officers
        or others. Specifically, a review of a statistically representative sample of
        300 of MPD's use of force files from January 1, 2010, to December 31,
        2020, 65 demonstrates that MPD officers used unnecessary and
        inappropriate levels of force in 28.6% of incidents in which they recorded
        using force.

---

[4] *Id.*
[5] *Id.*
[6] DEP'T HUM. RIGHTS, INVESTIGATION INTO THE CITY OF MINNEAPOLIS AND THE MINNEAPOLIS POLICE DEPARTMENT, 56 (Apr. 27, 2022).

MDHR Report at 46. Overall, MPD officers do not receive sufficient training with regards to use of force. *Id.*

81.　At all times material hereto, MPD's trainings reinforced a racially discriminatory culture that exacerbates race-based profiling. *Id.* at 39.

82.　The Minneapolis Police Department has a sustained problem with racial discrimination. In 1998, the Human Rights Watch conducted a study on the Minneapolis police department and found that the majority of officer-related complaints were made by people of color despite the fact that people of color constituted only one quarter of the city's population at that time.[7] "There is a basic distrust for the police and the black African-American feels that any time the police will turn on them and they will be the one incarcerated. If we are to make any progress, this basic distrust must be overcome."[8]

83.　MPD failed to adequately train its officers regarding policy changes and policing practices.[9] The Minnesota Department of Human Rights found that "maintaining clear policies and providing quality in-service training to effectuate those policies is crucial for ensuring that officers have the tools and resources they need to be successful, limit racial bias, and build community trust."[10]

---

[7] HUMAN RIGHTS WATCH, SHIELDED FROM JUSTICE: POLICE BRUTALITY AND ACCOUNTABILITY IN THE UNITED STATES, MINNEAPOLIS: RACE (1998), https://www.hrw.org/legacy/reports98/police/uspo85.htm.
[8] *Id.* (quoting the Urban League).
[9] DEP'T HUM. RIGHTS, INVESTIGATION INTO THE CITY OF MINNEAPOLIS AND THE MINNEAPOLIS POLICE DEPARTMENT, 41 (Apr. 27, 2022).
[10] *Id.* at 42.

84.    Supervisor expectations were consistently unclear and insufficient to properly
       implement policy changes. Field trainers are not required to participate in
       continuing education, furthering a pattern of racially discriminatory policing.[11]

## INJURIES

85.    Plaintiff suffered constitutional injuries under the Fourth and Fourteenth
       Amendments when he was seized and searched by the Defendant Officers on
       February 23, 2021 without probable cause or any reasonable articulation that a
       crime was being committed.

86.    Plaintiff's arrest constitutes false arrest and false imprisonment, and his liberty
       interests were infringed by Defendants' unlawful conduct.

87.    Plaintiff was charged with a felony as a consequence of Defendants'
       unconstitutional actions, and may be required to report that arrest on future
       employment applications or other applications that have a discretionary character,
       and the arrest might be used against him without his knowledge.

88.    Plaintiff suffered physically, emotionally, and financially due to his unjust
       incarceration.

89.    Plaintiff was incarcerated at Hennepin County Jail from February 23, 2021 until
       February 25, 2021 (three days) and at Sherburne County Jail from September 14,
       2021 until March 11, 2022 (179 days) as a direct consequence of Defendants'
       unconstitutional actions, and thereby lost his liberty and freedom of movement for

---

[11] *Id.* at 43.

a period of approximately 182 days.

90.   While Plaintiff was incarcerated at Sherburne County Jail, he was deprived of
      sunlight, indoor exercise, outdoor exercise, and healthy food for 179 days.

91.   While Plaintiff was incarcerated at Sherburne County Jail, he was deprived of
      sunlight for 179 days.

92.   Due to the COVID-19 pandemic, Sherburne County Jail frequently implemented
      lockdown measures that prevented Plaintiff from exercising indoors or outdoors.
      While incarcerated, his cells either lacked windows entirely or contained only
      covered windows.

93.   The food in Sherburne County Jail was unhealthy and barely edible. Plaintiff
      hardly ate any of the food provided because the food was "nasty" and "real slop."

94.   Due to stress brought on by his unconstitutional arrest and detention, Plaintiff
      experienced high blood pressure while incarcerated. As a result, his doctors
      advised him to avoid unhealthy food. In order to comply with these orders,
      Plaintiff could not eat Defendant Sherburne County Jail's inadequate food.
      Instead, he was forced to purchase food from the canteens.

95.   Plaintiff estimates that he spent at least $5,000 on food from the canteen, visits,
      and phone calls while incarcerated.

96.   Plaintiff was physically and mentally affected by the COVID-19 pandemic while
      falsely imprisoned in Sherburne County Jail.

97.   Sherburne County Jail's reaction to the COVID-19 outbreak was lackluster;
      according to Plaintiff, jail staff "didn't care about people having COVID."

98. Outbreaks of COVID-19 were common, and the Jail was often in some sort of lockdown or quarantine during Plaintiff's incarceration. Plaintiff was therefore frequently isolated, causing him to suffer from extreme stress and emotional distress.

99. In fact, Plaintiff was isolated upon entry to Sherburne County Jail for approximately one month.

100. In or around January 2022, Plaintiff contracted COVID-19 from one of his fellow prisoners. Before his incarceration at Sherburne County Jail, Plaintiff had never previously contracted the deadly virus.

101. His symptoms included a painful fever and difficulty breathing. While suffering from this dangerous virus, Plaintiff was quarantined for fourteen days, alone, in a cell without windows.

102. Due to his unlawful arrest and false imprisonment, Plaintiff contracted a deadly virus. He also suffered mentally as a result of his forced quarantine, which deprived him of sunlight and exercise.

103. When Defendants unlawfully arrested Plaintiff, his Oldsmobile Alero was towed and impounded. Plaintiff estimates the vehicle was worth approximately $3,500 at the time of arrest.

104. Plaintiff had his car impounded by the Defendants and was unable to retrieve it. While incarcerated, he could not find anyone who would be willing to pay to pick it up for him. Upon his release, Plaintiff called the Minneapolis Impound Lot, but staff informed him that his vehicle was no longer there.

105.    As a direct result of his unlawful arrest and forced imprisonment, Plaintiff lost property valued at approximately $3,500. The current whereabouts of his vehicle are unknown.

106.    Under MINN. STAT. § 299C.105 subd.3(a), (b), the Minnesota Bureau of Criminal Apprehension (BCA) is required to destroy biological specimens collected from a person found not guilty of a felony. The BCA must also return all records to such a person.

107.    Plaintiff's DNA was obtained by search warrant on the basis of Plaintiff's unconstitutional arrest and remains in Minneapolis's and/or MPD's internal databases against Plaintiff's will and without Plaintiff's consent.

108.    Plaintiff has not received notice that his biological specimens have been destroyed. Plaintiff

109.    Due to Plaintiff's wrongful incarceration, he was unable to attend the funeral of his cousin, Felicia Robinson, in March of 2022. It was stressful for Plaintiff to miss this important family event, and caused him to experience emotional turmoil. Plaintiff was close with his cousin Felicia, as he had known her since they were both children.

## CLAIMS FOR RELIEF

110.    Defendants' unreasonable seizure of Plaintiff's person and property violated Plaintiff's Fourth Amendment rights.

111.   Defendant Klund and Defendant Ottney engaged in race-based policing and violated Plaintiff's Fourteenth Amendment rights under the Equal Protection Clause.

112.   Defendant Minneapolis's custom(s) of encouraging and tacit authorization of MPD's use of excessive force against arrestees, detainees, and the like, was a moving force behind named Defendants' conduct in a manner sufficient for liability to attach under *Monell* and *Canton*. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

113.   Defendants' detention and arrest of Plaintiff without probable cause constitutes false arrest and false imprisonment under Minnesota tort law.

## **Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation**

(Plaintiff v. Individual Defendants)

114.   Plaintiff realleges and incorporates herein by reference all preceding and subsequent paragraphs of this Complaint.

115.   Defendants violated Plaintiff's right to be free from unreasonable seizure of his person when they stopped Plaintiff and initiated contact without having any legitimate reasonable suspicion that a crime was being committed and/or probable cause to stop or arrest Plaintiff.

116.   Defendants violated Plaintiff's right to be free from unreasonable seizure of his person when they boxed in and arrested Plaintiff without probable cause of any

crime having been committed and without any reasonable articulable suspicion that a crime was being committed.

117.   Defendants violated Plaintiff's right to be free from unreasonable use of force and unreasonable seizure of his person when they used a takedown technique on Plaintiff and pinned him to the ground while he posed no threat to officers.

118.   Plaintiff suffered harm as a direct and proximate result of Defendants' actions. These harms include but are not limited to physical injury, financial injury, emotional trauma, loss of liberty, and pain and suffering.

119.   Thus, Defendants violated the Fourth Amendment and 42 U.S.C. § 1983.

**<u>Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment (EQP) Violation</u>**

(Plaintiff v. Defendant Ottney & Defendant Klund)

120.   Plaintiff realleges and incorporates herein by reference all preceding and subsequent paragraphs of this Complaint.

121.   Defendants Klund and Ottney violated Plaintiff's right to equal protection when they decided to arrest Plaintiff in the absence of any probable cause or reasonably articulable suspicion that a crime had been committed on the basis of Plaintiff's race.

122.   Had Plaintiff been a "white male," rather than a "black male," reported to have a firearm, the Defendant MPD Officers would have treated Plaintiff differently by presuming that Plaintiff might have a lawful right to carry the firearm he was alleged to have had possession over and honoring his Fourth Amendment constitutional rights.

123.   Defendants violated Plaintiff's right to be free from unreasonable seizure of his person when they arrested Plaintiff without probable cause of any crime having been committed and without any reasonable articulable suspicion that a crime was being committed.

124.   Thus, Defendants Klund and Ottney violated the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1983.

## Count 3: *Monell* & *Canton* Liability

(Plaintiff v. City of Minneapolis)

125.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

126.   The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of MPD officers performing policing functions on behalf of the City.

127.   The Mayor, the City Council, and the Police Chief established and/or approved of MPD's written policies and training governing the conduct of MPD officers performing policing functions.

128.   The written policies and training established and/or approved by the Mayor, the City Council, and the Police Chief constituted the City's official policy and were the moving force behind and caused Plaintiff's injuries.

129.   Derek Chauvin—a former Minneapolis police officer who spent nineteen years on the force—pled guilty to using unreasonable force during the arrest of George

Floyd on May 25, 2020.[12] John Pope recently filed a federal civil rights lawsuit against Chauvin for the excessive force he used during his arrest in 2017.[13] In the complaint, Pope alleges MPD supervisors had access to body cameras documenting the excessive force yet failed to discipline any of the officers involved. *Id.*

130. This pattern of excessive force is not exclusive to former officer Chauvin. Officers in the Minneapolis Police Department have exhibited a disturbing tendency to use excessive force in their interactions with black individuals for decades.

131. In 1997, Craig Mische filed a § 1983 federal civil rights lawsuit against the MPD and Lieutenant Michael Sauro alleging violation of his constitutional rights.[14] On New Year's Eve, 1990, Sauro punched and kicked Mische after placing him in handcuffs. The jury found in Mische's favor, and released a special verdict which stated that "Sauro's employer, the City of Minneapolis, had maintained a custom of deliberate indifference to complaints concerning the use of excessive force by Minneapolis police officers."[15]

132. Although then-mayor Sharon Sayles Belton terminated Sauro's employment with the city of Minneapolis, he filed under the Police Officers' Federation of

---

[12] Amy Forliti, *Chauvin Pleads Guilty to Federal Charge in Floyd's Death*, Assoc. Press (Dec. 15, 2021), https://apnews.com/article/death-of-george-floyd-george-floyd-minneapolis-race-and-ethnicity-st-paul-a8b12b1e3e0fedc1270c659e3428134e.
[13] Rochelle Olson, *Chuavin, MPD Named in 2 Federal Excessive Force Lawsuits Dating to 2017, Involivng Teenager, Woman*, PBS Frontline
[14] City of Minneapolis v. Police Officers' Fed'n of Minneapolis, 566 N.W.2d 83, 85 (Minn. Ct. App. 1997).
[15] *Id.*

Minneapolis's Collective Bargaining Agreement.[16] He was reinstated with rank and back pay after an arbitrator ruled he was improperly terminated.[17]

133.  Police Chief Olson said at the time that the arbitration system "is the biggest barrier he face[d] in his efforts to hold police officers accountable for misconduct."[18]

134.  This was not the first allegation of excessive force involving Lt. Michael Sauro. In 1989, Sauro led a group of officers who threw a flashbang grenade into the apartment of Lloyd Smalley and Lillian Weiss.[19] The couple died from smoke inhalation after their apartment caught fire. Officers were conducting a drug raid, and claimed that they did not even know that the two elderly individuals lived in the apartment.[20] No drugs or weapons were ever found in the apartment.[21]

135.  The public's trust in the MPD continued to deteriorate after several incidents in the early 2000s, prompting the U.S. Department of Justice to create an agreement

---

[16] *Id.* at 86.

[17] HUMAN RIGHTS WATCH, SHIELDED FROM JUSTICE: POLICE BRUTALITY & ACCOUNTABILITY IN THE UNITED STATES, MINNEAPOLIS: INCIDENTS (June 1998), https://www.hrw.org/legacy/reports98/police/uspo86.htm.

[18] *Id.*

[19] *Id.*

[20] Dan Oberdorfer & Wendy S. Tai, *FBI Asked to Probe Deaths in Drug Raid—Police Actions Questioned*, STAR TRIBUNE (Jan. 28, 1989).

[21] *Id.*

with the MPD.[22] The agreement set goals for improving the department's use of force, but the agreement expired in 2008 and was not renewed.[23]

136.  Individual officers continued to evade discipline for excessive force well into the 2010s. Despite five documented instances of excessive force in less than one year, Blayne Lehner kept his job with the MPD.[24] Lehner was ultimately suspended for fifteen hours and received a letter of reprimand.[25]

137.  He was later fired for a separate incident, but was reinstated after arbitration.[26] He was finally terminated after kicking a handcuffed teenager in the face in 2013, breaking his jaw and nose.[27] He was on paid leave for four years while internal affairs investigated his conduct.

138.  Throughout the 1990s and the early 2000s, MPD "trained its officers to be 'warrior cops,' formally with courses like 'Weapons of Mass Destruction,' and

---

[22] Libor Jany, *Minneapolis Chief Open to Revisiting 2003 Agreement to Improve Policy-Community Relations*, STAR TRIBUNE (Oct. 18, 2017), https://www.startribune.com/minneapolis-chief-open-to-revisiting-agreement-to-improve-police-community-relations/451524163/.
[23] *Id.*
[24] Max Nesterak, *Ex-Minneapolis Cop had History of Kicking People in the Face*, MINN. REFORMER (Dec. 18, 2020), https://minnesotareformer.com/2020/12/18/ex-minneapolis-cop-had-history-of-kicking-people-in-the-face/.
[25] *Id.*
[26] Ryan Raiche, *MPD Officer Who has Been Fired Twice for Excessive Force will Remain Fired Following Arbitration Ruling*, 5 EYEWITNESS NEWS (Jan. 10, 2022), https://kstp.com/5-investigates/mpd-officer-who-has-been-fired-twice-for-excessive-force-will-remain-fired-following-arbitration-ruling/.
[27] *Id.*

informally on the streets."[28] The department has even awarded officers who use

aggressive methods to detain individuals.[29]

139.   In 2019, Minneapolis Mayor Jacob Frey banned "warrior-style" training, but

former Minneapolis Police Union President Lt. Bob Kroll insisted that the union

would continue to provide the training.[30] The pervasive effect of the warrior-style

training on MPD officers is clear in their continual use of excessive force,

especially against people of color.

140.   On May 30, 2020, numerous members of the MPD violently assaulted Jaleel

Stallings and Virgil Lee Jackson, Jr. even though Mr. Stallings, Mr. Jackson, and a

third individual were all on the ground with their hands empty and is plain view of

the MPD officers. Mr. Stallings suffered a broken eye socket, among other

injuries. After this incident, the offending officers were permitted to continue

performing police functions for months instead of being immediately placed on

administrative leave even though the use of force incident was captured on

numerous MPD body cameras.

141.   Prior to Plaintiff's arrest on February 23, 2021, the City knew or constructively

knew of MPD's unconstitutional patterns and practices and that the same gave

rise to a risk of violations of citizens' federal rights.

---

[28] *See* Nesterak & Webster, *supra* note 3 at 10.
[29] *Id.* at 8.
[30] Inae Oh, *Minneapolis Banned Warrior-Style Police Training. Its Police Union Kept Offering it Anyway*, MOTHER JONES (May 28, 2020), https://www.motherjones.com/crime-justice/2020/05/bob-kroll-minneapolis-warrior-police-training/.

142.    The City, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from MPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

143.    On or prior to February 23, 2021, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of unreasonable searches and/or excessive force by MPD officers. This custom is especially pronounced in the subsect of MPD officers within the MPD's police division(s) that include the homicide, robbery, drugs, or weapons units.

144.    On or prior to Plaintiff's arrest on February 23, 2021, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered, or ratified a number of customs, patterns, or practices that violated the Equal Protection Clause of the Fourteenth Amendment by condoning and requiring officers to treat members of the Black Community of Minneapolis differently, including but not limited to implementing non-deadly force and deadly force at a higher rate against Black men who did not pose a threat to officers.

145.    On or prior to February 23, 2021, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to

correct, promoted, or ratified a number of customs, patterns, or practices that rendered the process of filing misconduct complaints against MPD officers a farce.

146.   On or prior to February 23, 2021, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that conspired to deprive black arrestees, black detainees, and the like of their civil rights, including but not limited to obstructing such individuals' access to recovery in federal or state courts.

147.   City officials were and continue to be especially tolerant of Fourth and Fourteenth Amendment (Equal Protection Clause) violations by MPD officers who are apprehending black individuals suspected to have a firearm, even when those suspicions prove to be ill-founded, and even when those suspicions cannot reasonably lead the officers to believe the suspect has committed any crime.

148.   When City officials receive complaints of excessive force used by MPD officers within the MPD's police division(s) that include the homicide, robbery, drugs, or weapons units, City officials have a custom of absolving those MPD officers of responsibility for their actions, thereby ratifying Fourth Amendment violations by MPD officers in these divisions and signaling to MPD officers in these divisions that future use Fourth Amendment violations will not result in discipline from the City.

149.   The low rate of discipline for police officers accused of violating the Fourth
Amendment rights of arrestees is a function of City policy and custom.

150.   Illustratively, Chapter 172 of Title 9 of the Minneapolis Code of Ordinances
("the Code") delineates the rules governing "Police Conduct Oversight."
Sections 172.10-172.40 make it abundantly clear that the Police Conduct
Oversight System established by the City puts the power of reviewing civilian
complaints made against police largely in the hands of police and other City
officials. *Accord* Code of Ordinances, Title 9, § 172.40(1) ("**Each review panel
shall be comprised of four (4) panelists. Two (2) of the panelists shall be
sworn officers of the police department holding the rank of lieutenant or
higher assigned by the chief of police or the chief's designee** and two (2)
panelists shall be civilians assigned by the director of civil rights or the director's
designee.") (emphasis added).

151.   In other words, the City Council has structured the Police Conduct Oversight
System in a way that ensures the two police officer members of each review
panel can consistently vote that no misconduct occurred as a way to make sure
that the Police Conduct Oversight panel can never determine that misconduct has
been established by a preponderance of the evidence without the express consent
of the MPD. The moral hazard implicit in such a policy is breathtaking.

152.   For the Police Conduct Review panel to sustain an allegation of police officer
misconduct, Section 172.40(6) of the Code requires that a "preponderance of the
evidence" demonstrates that the allegation has merit. Because the structure of

each review panel ensures that the civilians on the panel can never constitute a

majority vote, it is thereby impossible for civilians to find that misconduct was

committed without the assistance of police officers who are captive to the MPD

and its institutional interests. Consequently, it is unsurprising that, historically,

Minneapolis has disciplined so few of its police officers accused of misconduct

(unless we are to believe that from 2013-2021, an incredible 96.5% of civilian

complainants were mistaken in their firmly held belief that a police officer

committed misconduct).

153.  Making matters worse, even when a preponderance of the evidence demonstrates

that an allegation of misconduct is bona fide, the Code does not require that the

officer or officers be disciplined. *See generally* Code of Ordinances, Title 9,

Chapter 172, § 172.70 (giving the chief of police complete discretion regarding

whether to discipline the officer).

154.  Similarly, even when the Police Conduct Review panel recommends discipline,

it has no formal authority to issue discipline and must instead send its

"recommendation" which is "forwarded to the chief of police." Code of

Ordinances, Title 9, Chapter 172, § 172.40(4).

155.  Sections 172. 20, 172.40, and 172.70 of the Code combine to demonstrate that

black-letter City policy consolidates *all* disciplinary power over MPD police

officers in the chief of police and explicitly permits the chief of police to refuse

to discipline MPD officers for misconduct involving (1) use of excessive force,

(2) inappropriate language or attitude, (3) harassment, (4) discrimination in the

provision of police services or other discriminatory conduct on the basis of race, color, creed, religion, ancestry, national origin, sex, disability, age, or sexual orientation, (5) theft, (6) failure to provide adequate or timely police protection, (7) retaliation, (8) any violation of the MPD's policy and procedure manual, or (9) criminal misconduct *even when a preponderance of the evidence in support of a complaint alleging police misconduct demonstrates that it is more likely than not that misconduct occurred.*

156. This absurd system explains why the disciplinary rate for police officers is so low in relation to the number of serious misconduct complaints made against MPD officers over several years before February 23, 2021. The policies enacted by Minneapolis to review allegations of police misconduct ensure that a biased decisionmaker—one who relies on having a stable of police officers ready at any given moment—decides whether police officers committed misconduct. The policies enacted by Minneapolis allow the chief of police to determine that a police officer did not commit misconduct and should not be punished for misconduct *even when a wealth of credible and probative evidence compels a contrary conclusion.*

157. On or prior to February 23, 2021, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices of refusing to discipline MPD officers who have committed misconduct.

158.    Because the City's chief of police has sole control over disciplining MPD police
        officers who have committed misconduct, any systematic routine failures to
        discipline MPD officers for misconduct is directly attributable to the City as a
        function of the City's custom of not disciplining the vast majority of police
        officers who have committed misconduct as that term is defined by Section
        172.20 of the Code. Moreover, because the custom flows from the direct actions
        of the City's chief of police, it is abundantly clear that Minneapolis knew this
        unlawful custom of under disciplining MPD police officers.

159.    City officials, including but not limited to the chief of police, the Mayor, the City
        Council, and members of the Police Conduct Oversight Commission, all
        understand that the investigations and findings of the Police Conduct Oversight
        Commission are confidential, especially when the investigations and findings
        relate to an officer who is deemed an "undercover law enforcement officer,"
        which includes in some capacity most or all of the MPD officers within its
        division(s) that include the homicide, robbery, drugs, or weapons units, as (1)
        these units are especially likely to rely on undercover officers, and (2) obtaining
        personnel data relating to complaints against undercover officers is impossible
        under the Minnesota Data Practices Act because "[a]ll personnel data maintained
        by a government entity relaying to an individual employed as or an applicant for
        employment as an undercover law enforcement officer are [*per se*] private data"
        not subject to public disclosure. *Accord* Code of Ordinances, Title 9, Chapter
        172, § 172.30(f) ("Information from investigations shall be shared only with staff

assigned to the office of police conduct review and police conduct oversight

commission, unless otherwise specifically authorized by law."); Code of

Ordinances, Title 9, Chapter 172, § 172.85 ("The members, staff, and contractors

of the office of police conduct review and the police conduct oversight

commission shall comply with all of the provisions of the Minnesota

Government Data Practices Act, Chapter 13 of Minnesota Statutes. All members

and contractors, paid and volunteer, shall sign a contract agreeing to comply with

the provisions of the Minnesota Government Data Practices Act, currently

Chapter 13 of Minnesota Statutes."); MINN. STAT. § 13.02, subd.8a ("'Not public

data' are any government data classified by statute, federal law, or temporary

classification as confidential, private, nonpublic, or protected nonpublic.");

MINN. STAT. § 13.43, subd.5 ("All personnel data maintained by a government

entity relating to an individual employed as or an applicant for employment as an

undercover law enforcement officer are private data on individuals. When the

individual is no longer assigned to an undercover position, the data described in

subdivisions 2 and 3 become public unless the law enforcement agency

determines that revealing the data would threaten the personal safety of the

officer or jeopardize an active investigation.").

160.    The City's custom of under-disciplining MPD police officers in circumstances

where a preponderance of the evidence demonstrates that an MPD officer

committed misconduct, but the Police Conduct Oversight panel nonetheless

determines that a preponderance of the evidence does not demonstrate that

misconduct occurred, deprives would-be or actual civil rights plaintiffs of evidence that would assist them in prosecuting civil rights actions under 42 U.S.C. § 1983 against the City or its employees. This custom is the result of a conspiracy by city officials to systematically cover up MPD police misconduct by creating an oversight commission that is set up in a manner that permits MPD to determine whether the evidence in any given complaint shows that misconduct by MPD officers has occurred with the understanding that MPD is a self-serving entity that will protect the interests of itself and its' officers, and, by association, will protect the City's interests in avoiding civil liability traceable to misconduct committed by MPD's officers in the scope of their duties.

161.    On or prior to February 23, 2021, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

162.    Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employ Defendant officers despite knowing of their repeated unconstitutional, unlawful, or other improper conduct.

163.    Minneapolis had the power to terminate or appropriately discipline Defendants for their misconduct prior to February 23, 2021, but failed to do so despite the City's knowledge of a pattern of complaints regarding Fourth Amendment violations.

164. The unconstitutional policies, practices, and customs defined herein were the moving force behind Plaintiff's injuries.

165. Plaintiff's injuries occurred as a direct and proximate result of the acts and omissions by Minneapolis.

166. As a direct and proximate result of the acts and omissions described herein, Plaintiff suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

167. Plaintiff is entitled to recovery of costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## Count 4: MINN. STAT. § 466.02 – False Arrest

### (Plaintiff v. All Defendants)

168. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

169. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

170. The tort of false arrest "protects the personal interest in freedom from restraint of movement." *Lundeen v. Renteria*, 224 N.W.2d 132, 146 (Minn. 1974). "The restraint may be imposed by the assertion of legal authority, and if an arrest is made without proper legal authority, it is a false arrest." *Id.*

171. In order to prevail on a claim for false arrest, a plaintiff must demonstrate "(1) an arrest performed by defendant, and (2) the unlawfulness of such arrest." *Perkins v. St. Louis Cnty.*, 397 N.W.2d 405, 408 (Minn. Ct. App. 1986); *see also Sang v.*

*City of St. Paul*, 2010 WL 2346600, at *7 (D. Minn. June 8, 2010). "The test for the lawfulness of plaintiff's arrest is whether it was made with 'probable cause.'" *Lundeen*, 224 N.W.2d at 136.

172. Probable cause, as defined by Minnesota law, is "a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty" of a crime. *State v. Harris*, 121 N.W.2d 327, 330-31 (Minn. 1963) (quoting *Garske v. United States*, 1 F.2d 620, 623 (8th Cir. 1924)).

173. When Defendants approached Plaintiff on February 23, 2021, they had no more than innocuous information from a confidential informant. They had no information to suggest that any crime had been committed. As such, they could not have had a reasonable ground of suspicion that Plaintiff was guilty of a crime and had no probable cause to arrest him.

174. Accordingly, Defendants committed the tort of false arrest when they unlawfully detained and arrested Plaintiff without probable cause and with the assertion of legal authority.

175. As a direct and proximate result of Defendants' actions, Plaintiff suffered harm including but not limited to physical injury, emotional trauma, and loss of liberty.

176. Thus, Defendants committed an actionable false arrest tort under Minnesota law.

**Count 5: MINN. STAT. § 466.02 – False Imprisonment**

(Plaintiff v. All Defendants)

177.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

178.   Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

179.   False imprisonment is "any imprisonment which is not legally justifiable." *Kleidon v. Glascock*, 10 N.W.2d 394, 397 (1943).

180.   "If an arrest is made without legal authority, it is a false arrest. Subsequent restraint is false imprisonment." *Perkins v. St. Louis Cnty.*, 397 N.W.2d 405, 408 (Minn. Ct. App. 1986) (citing *Lundeen*, 224 N.W.2d at 135).

181.   Because Defendants committed the tort of false arrest and continued to restrain Plaintiff, Defendants also committed the tort of false imprisonment.

182.   Plaintiff was falsely imprisoned for approximately 182 days as a direct and proximate cause of Defendants' unlawful actions.

183.   As a direct and proximate result of Defendants' actions, Plaintiff suffered harm including but not limited to physical injury, emotional trauma, and loss of liberty.

184.   Thus, Defendants committed an actionable false imprisonment tort under Minnesota law.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.      As to Count 1, a money judgment against Defendants Klund, Ottney, and Pond, for compensatory, special, and punitive damages, and punitive damages together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

B.      As to Counts 2, a money judgment against Defendants Klund and Ottney for compensatory, special, and punitive damages, and punitive damages together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

C.      As to Count 3, a money judgment against Defendant City of Minneapolis for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

D.      As to Counts 4-5, a money judgment against all Defendants for compensatory and special damages in an amount to be determined together with costs and disbursements, including prejudgment interest.

E.      Grant such other relief as may be just and reasonable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: November 4, 2022                    Respectfully submitted,

                                           /s/ Nico Ratkowski

NICO RATKOWSKI
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
663 University Avenue W., STE 200
Saint Paul, Minnesota 55104
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiff*

<u>**VERIFICATION OF COMPLAINT**</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and he believes same to be true, and he further states that the sources of this information and belief are documents provided to him by Plaintiff, Defendant(s), and third-party witnesses.

DATED: November 4, 2022                    Respectfully submitted,

<u>/s/ Nico Ratkowski</u>
Nico Ratkowski
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
663 University Avenue W., STE 200
Saint Paul, Minnesota 55104
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiff*